# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RESOURCE SERVICES, LLC, | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 3:07-cv-586 (JCH) |
| | : | |
| CITY OF BRIDGEPORT, | : | |
| Defendant. | : | DECEMBER 18, 2008 |

## RULING RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOC. NO. 47] AND MOTION TO DISMISS [DOC. NO. 48]

## I.    INTRODUCTION

Plaintiff, Resource Services, LLC ("Resource Services"), brings this
discrimination and breach of contract action against defendant, City of Bridgeport,
Connecticut ("City of Bridgeport" or "the City").  Resource Services is a Connecticut
limited liability corporation, formed in 1998, engaged in general contracting and
landscaping.  It is wholly-owned by Jimmy Ray Cooper ("Cooper"), who is African-
American.  Prior to 1998, Cooper held Resource Services as a sole proprietorship.  The
City of Bridgeport is an incorporated municipality in the State of Connecticut.

Resource Services claims that, after it allegedly entered into a contract with the
City to refurbish an AIDS residential services facility, the City improperly terminated the
contract.  Specifically, Resources Services alleges three causes of action: 1) a claim
under 42 U.S.C. § 1983 for racial discrimination in violation of its civil rights; 2) a claim
for breach of contract under Connecticut state law; and 3) a claim for breach of the
implied covenant of good faith and fair dealing under Connecticut state law.

The City has moved for summary judgment as to all three claims.  <u>See</u> Doc. No.

47.  In the alternative, the City has requested that the court grant summary judgment as to Count One, and decline to exercise supplemental jurisdiction over counts two and three.  See Doc. No. 48.  The City argues that it is entitled to summary judgment on Count One because, inter alia, Resource Services has failed to make out a prima facie case of discrimination based on race.  The court agrees.

For the reasons stated below, the defendant's Motion for Summary Judgment [Doc. No. 47] is **GRANTED**, in part, as to Count One.  With the only federal claim dismissed, the court declines to exercise supplemental jurisdiction over the breach of contract claims.  Accordingly, defendant's Motion to Dismiss [Doc. No. 48] is **GRANTED** as to Counts Two and Three, and those claims are dismissed without prejudice to refiling in state court.

## II.    STANDARD OF REVIEW

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000).

Once the moving party has met its burden, in order to defeat the motion the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor, Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

Generally, when assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is

sought.  <u>Anderson</u>, 477 U.S. at 255; <u>Graham</u>, 230 F.3d at 38.  "This remedy that

precludes a trial is properly granted only when no rational finder of fact could find in

favor of the non-moving party."  <u>Carlton v. Mystic Transp., Inc.</u>, 202 F.3d 129, 134 (2d

Cir. 2000).  "When reasonable persons, applying the proper legal standards, could

differ in their responses to the question" raised on the basis of the evidence presented,

the question must be left to the jury.  <u>Sologub v. City of New York</u>, 202 F.3d 175, 178

(2d Cir. 2000).

## III.    BACKGROUND[1]

Resource Services is a Connecticut limited liability company formed in 1998, and

is solely owned by Jimmy Ray Cooper, who is African-American.  Defendant's Local

Rule 56(a)(1) Statement ("Def. 56(a)(1) Stmt.") at ¶ 4; Plaintiff's Local Rule 56(a)(2)

Statement ("Pltff. 56(a)(2) Stmt."), Disputed Issues of Material Fact at ¶ 1.  Resource

Services is a general contracting and landscaping company that has been doing

business with the City of Bridgeport since approximately 1992.  Def. 56(a)(1) Stmt. at ¶

5.  Resource Services has been the successful lowest qualified bidder on a number of

contracts with the City, for services ranging from rehabilitating housing stock to

installing sidewalks and landscaping.  May 20, 2008 Deposition of Jimmy Ray Cooper

("Cooper Depo."), Exhibit Tr-1 to Plaintiff's Memorandum in Opposition ("Mem. in Opp.")

at 13-15.  The Complaint in the present action was filed on April 17, 2007, and arises

out of Resource Services' involvement in a contracting project known as the Helping

---

[1]For the purposes of the instant motion, the court accepts facts undisputed by the parties and
supported by evidence as true, and resolves disputed facts in favor of the nonmoving party where there is
evidence to support his allegations.

Hand Project.

On April 22, 2004, the City solicited bids for rehabilitation work on a building at 1154-1156 Iranistan Avenue in Bridgeport, Connecticut ("the Helping Hand Project"). Def. 56(a)(1) Stmt. at ¶ 7. At all times relevant to this action, the building at 1154-1156 Iranistan Avenue was owned by The Helping Hand Center, Inc. ("Helping Hand Center"), a residential housing facility for persons with AIDS. Id. Resource Services, however, was not aware that the Helping Hand Center owned the building in question, and the invitation to bid did not specify the owner of the building.[2] Ptff. 56(a)(2) Stmt. at ¶ 7.

When it solicited bids for the Helping Hand Project, the City's Department of Housing and Community Development planned to act as the administrator for certain funds the City would receive from the United States Department of Housing and Urban Development ("HUD") through a special funding stream known as Housing Opportunities for People With Aids ("HOPWA"). Def. 56(a)(1) Stmt. at ¶ 8. These funds were to be provided by HUD in the form of a loan to the Helping Hand Center. Accordingly, the City claims, it did not intend to be a party to the contract with the contractor who won the bid. Rather, it was the City's intention that the proposed contract was to be entered into directly between the winning bidder and the Helping Hand Center. Id. at ¶ 9.

At the time of the bidding, however, Resource Services had no knowledge of,

---

[2] The Invitation to Bid stated only, "The successful contractor shall enter into a contract with the property owner. The Department of Housing will act as construction manager for the project." Invitation to Bid, Exhibit 22 to Defendant's Memorandum in Support ("Mem. in Supp."), at 2.

and was given no specifics regarding, the funding of the Helping Hand Project. Ptff. 56(a)(2) Stmt. at ¶¶ 8, 9. It was Resource Services' belief that, if it won the competitive bidding process, it would be contracting directly with the City, as it had done in previous projects. Id.

Resource Services eventually won the competitive bidding process for the Helping Hand Project with a bid of $209,500.00. Def. 56(a)(1) Stmt. at ¶ 11. On May 17, 2004, the City sent Resource Services a letter ("the award letter"), stating:

> Subject to the filing in this office of an acceptable Performance and Payment Bond or Letter of Credit, and a Certificate of Insurance, including Worker's Compensation, as called for in the Specifications, it is our intention to award to [Resource Services] a contract with regard to [the Helping Hand Project].

Award Letter, Exhibit 6 to Plaintiff's Mem. in Opp. On May 28, 2004, Resource Services provided the City with a Performance and Payment Bond and a Certificate of Insurance. Def. 56(a)(1) Stmt. at ¶ 13. The City subsequently determined that the bond and the certificate were acceptable. Id.

Following Resource Services' submission of the required paperwork, however, progress on the Helping Hand Project stalled. While Resource Services claims that it "used due diligence" in trying to ascertain when the City was going to provide it with a notice to commence work, it received no written communication from the City for approximately 16 months. Plaintiff's Mem. in Opp. at 5. Then, in a letter dated September 26, 2005, the City notified Resource Services, that "[i]n regards to the [Helping Hand Project], please be advised that this work is temporarily on hold pending resolution of HUD related compliance issues with the project's sponsor – The Helping Hand Center. We are hopeful that these matters will be resolved within the next month,

though we cannot guarantee if the project will in fact proceed." Exhibit 12 to id. The project, however, did not proceed. Neither Resource Services nor any other entity performed any rehabilitation work on the building at 1154-56 Iranistan Avenue in connection with the Helping Hand Project.

The reason for the delay and eventual cancellation of the Helping Hand Project – and the implications thereof – form the crux of this action. Resource Services alleges that the reason it never received a notice to commence work was because Cooper, its sole member, is African-American, and the City has a pervasive practice of racial discrimination in the awarding of contracts.[3] Further, it alleges that by winning the competitive bid process and providing the City with the required paperwork, it entered into a contract with the City to perform the rehabilitation work for the Helping Hand Project, and therefore the City breached that contract when it failed to give Resource Services notice to commence work.

The City, on the other hand, asserts that the Helping Hand Project was delayed and eventually cancelled for a number of administrative reasons, but primarily because the Helping Hand Center failed to comply with HUD/HOPWA funding requirements.[4] Def. 56(a)(1) Stmt. at ¶ 24. Specifically, it claims that the Helping Hand program suffered from a number of problems including, inter alia, that it violated HUD's rules and

---

[3]In response to this allegation, the City notes that, since 1992, Resource Services has been awarded, and has successfully completed, a number of City contracts. Resource Services admits that it has been doing business with the City since 1992, but does not accept that this fact casts doubt on its allegation that the City has a pervasive practice of discrimination in the awarding of contracts.

[4]Resource Services points out, and the City admits, that the City first learned of the Helping Hand Center's compliance issues in May 2005, nearly one year after Resource Services won the competitive bidding process. The City attributes the delay from May 2004 to May 2005 to the City's attempts to address issues arising from an audit by the Office of the Inspector General, and Helping Hand's delay in securing closing documents for the contract. Defendant's Mem. in Supp. at 6.

regulations "relating to the separation of church and state" by requiring that residents attend religious services.  Id. at ¶¶ 17-24.  With regards to Resource Services' contract claims, the City asserts that it was never the intention of the City to enter into a contract with the winning contractor, and that no contract was formed because a final, comprehensive written agreement was never signed.  Id. at ¶¶ 24, 25.

## IV.    ANALYSIS

### A.  Count One

Resource Services' first cause of action is a civil rights claim pursuant to 42 U.S.C. § 1983.  There are two distinct parts to a section 1983 claim against a municipality.  See Lathrop v. Onondaga County, 220 F. Supp. 2d 129, 134 (N.D.N.Y 2002).  First, the plaintiff must establish a valid section 1983 claim.  Second, the plaintiff must establish that the municipality may be held liable for that action based upon the requirements for municipal liability set forth in Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658 (1978).  Because the court determines that, with respect to its section 1983 claim, Resource Services creates no genuine issue of material fact sufficient to withstand the City's Motion for Summary Judgment, the court does not reach the question of municipal liability under Monell.

To state a valid claim under 42 U.S.C. § 1983, the plaintiff must allege that the challenged conduct: 1) was attributable to a person acting under color of state law; and 2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States.  See 42 U.S.C. § 1983; see also Whalen v. County of Fulton, 126 F.3d 400, 405 (2d Cir. 1997).  There is no dispute, in this case, that the defendant was acting under color of state law.  Therefore, the court must address whether the

7

City's actions deprived Resource Services of a right, privilege, or immunity secured by the Constitution or laws of the United States.

"Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." <u>Thomas v. Roach</u>, 165 F.3d 137, 142 (2d Cir. 1999). Thus, as the parties acknowledge, the first step in a section 1983 action is to identify the right, privilege, or immunity that has been violated. <u>See</u> Plaintiff's Mem. in Opp. at 9; Defendant's Reply at 6. Resource Services' Complaint, however, does not identify the specific right allegedly violated by the City. The Complaint merely states that, "the conduct of the Defendant is under color of state law and violates the Plaintiff's civil rights in violation of applicable law." Complaint at ¶ 27. Nowhere in the Complaint does Resource Services specify the substantive legal right, privilege, or immunity which it refers to as its "civil rights."

Further, when the City requested, by interrogatory, that Resource Services "identify the specific civil rights . . . which Plaintiff alleges were violated," Resource Services again failed to identify a specific right. <u>See</u> Exhibit 16 to Defendant's Motion for Summary Judgment ("Motion for S.J.") at 12. Instead, it answered that, "Plaintiff was discriminated against in the treatment he received from the City of Bridgeport . . . in connection with bidding on and/or the awarding or non-awarding of contracts because he is African-American." <u>Id.</u> It is only in its Memorandum in Opposition to Summary Judgment that Resource Services attempts to specify, for the first time, the rights allegedly violated by the City. In that Memorandum, Resource Services states:

> The Fourteenth Amendment provides rights to equal protection of the laws and due process. A person's civil rights are protected under the Fourteenth Amendment. The Defendant, City of Bridgeport, is a person within the

> meaning of the Fourteenth Amendment. Accordingly, the Plaintiff has stated
> a valid racial discrimination claim seeking relief based upon a civil rights
> violation under the Fourteenth Amendment against the Defendant, City of
> Bridgeport.

Plaintiff's Mem. in Opp. at 13. Resource Services also states in the same

Memorandum that, it "has alleged racial discrimination by defendant in the awarding

and/or performance of contracts. This allegation of racial discrimination falls into the

Plaintiff's federally protected rights set forth in the Fourteenth Amendment, which

provides for due process and equal protection of the laws." Id. at 21. Despite its

invocation of the Fourteenth Amendment, however, Resource Services never specifies

whether it is alleging violation of the Equal Protection Clause or the Due Process

Clause, and if the latter, whether the alleged violation concerns procedural due process

or substantive due process.

It is also important to note that the majority of cases cited by Resource Services

in its Memorandum in Opposition to Summary Judgment involve claims brought under

42 U.S.C. § 1981 or Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e)-

2(a)(1). Title VII proscribes discrimination in the employment context and is

inapplicable in this case. Section 1981, however, prohibits, inter alia, racial

discrimination in the making and enforcement of contracts, and would typically be the

basis for a cause of action in claims such as the one brought by Resource Services.

Consequently, while Resource Services does not explicitly invoke section 1981, in the

interests of justice, the court will analyze Resources Services' civil rights claim under

section 1981, in addition to the Equal Protection and the Due Process Clauses.

1. Equal Protection

To maintain an equal protection claim, a plaintiff is required to show: 1) adverse treatment compared with other similarly situated individuals; and 2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.  See Miner v. Clinton County, 541 F.3d 464, 474 (2d Cir. 2008). Resource Services alleges that it was denied equal protection under the law because the City breached a contract with, or failed to award a contract to, Resource Services, solely because Cooper is African-American.  Further, it alleges that the discrimination suffered by Resource Services during the Helping Hand Project contracting process is a result of the City's pervasive practice of awarding contracts to non-minority businesses or individuals rather than to the lowest qualified bidder.

In order to survive a motion for summary judgment on an equal protection claim, the Supreme Court has held that a plaintiff must offer some evidence of a "discriminatory intent or purpose" on the part of the defendant.  See City of Cuyahoga Falls v. Buckeye Cmty. Hope Found., 538 U.S. 188, 194 (U.S. 2003).  "Discriminatory intent or purpose" implies that the defendant "selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group."  Personnel Administrator v. Feeney, 442 U.S. 256, 279 (1979). Thus, for an equal protection claim based on racial discrimination, the plaintiff must come forward with "at least some credible evidence that the actions of [the defendant] were motivated by racial animus or ill-will."  Grillo v. N.Y. City Transit Auth., 291 F.3d 231, 234 (2d Cir. 2002).  As a result, evidence which merely indicates disparity of

treatment, rather than purposeful or invidious discrimination, is insufficient to show discriminatory intent or purpose. See McCleskey v. Kemp, 481 U.S. 279, 292 (1987).

In the present case, Resource Services supports its section 1983 claim with: 1) Cooper's testimony regarding the City's treatment of Resource Services during the course of the Helping Hand Project and a number of previous projects; 2) Cooper's testimony that George Eads, a former employee of the City of Bridgeport, told him that the City generally awarded higher-dollar-amount contracts to non-minority contractors; and 3) a 2005 study which concluded that the City underutilizes minority contractors. This evidence will be addressed in turn.

First, Resources Services' primary support for its section 1983 claim is Cooper's testimony regarding the City's treatment of Resource Services during the course of the Helping Hand Project and a number of previous projects. The court must determine whether this testimony amounts to "some credible evidence that the actions of [the City] were motivated by racial animus or ill-will." Grillo, 291 F.3d at 234. The court will first consider Cooper's deposition testimony, followed by his answers to the City's interrogatories.

At deposition, in response to the City's query whether Cooper had any factual support for his claim that he was discriminated against on the basis of race in connection with the Helping hands Project, Cooper testified that:

> The factual facts that I'm basing [my allegations] on is previous experiences in interaction with the City, other contacts of previous treatment that I have had, experienced. I have gone to court. Sued the City. Different instances. I have had to go to HUD, filed complaints on City employees where they -- they -- you bid the project and there's other requirements in there that aren't part of the scope of the work and they just try to have additional hardship on you. If you won a particular job, you can't even make any money on it.

11

Cooper Depo. at 33.  He further elaborated on his knowledge of the allegedly

discriminatory practices of the City, by stating that:

> Over the years, my dealings with the City, there's been, you know, different
> times where contracts were awarded, they wouldn't give to us.  They would
> give to, you know, friends or family of the city.  They come in with different
> excuses of why that, we weren't being awarded a job after we expended
> expenses to meet our requirements for these different projects.  There's
> been times we're actually working on the project where they give you undue
> hardships, making it very difficult for you to basically fulfill your contract
> obligations.

Id. at 20-21.  In the same deposition, Cooper was also asked, "what individuals with the

City of Bridgeport do you believe made a decision to discriminate against you on the

basis of your race?"  He replied that:

> I think it's systematical in the City of Bridgeport on the process that they
> basically carry out.  It's not a written, you know, policy.  It's just, like I say,
> subtle because there's so much nepotism in the City.  If you are talking to
> one, you might be talking to the family member of City employees or
> someone that's in an elected position in the City.

Id. at 21.  The City subsequently asked whether Cooper believed that the City of

Bridgeport had a practice of discrimination which resulted in his being discriminated

against in connection with the Helping Hands Project.  Cooper replied, "You are saying

the entity, the City?  No.  I think the City employees let the elected officials have an

unspoken practice, is what I believe."  Id. at 30-31.  When asked the basis of this belief,

Cooper testified that:

> Because, like I say, from my experience of other contractors which you bid
> over time, I have seen the same thing was put, you bit the project.  If the bid
> wasn't going which, the way they anticipate for certain, you know,
> companies, they would in turn find ways of saying well, we only -- we don't
> have the funding for the project or there's some type of administrative lacking
> in those projects.  It's been my experience.

Id.  When asked whether, in his experience, the situation he described would result in a person of another race receiving the projects in question, Cooper's testimony was, "In some cases, yes."  Id.

While Cooper's deposition testimony is too lengthy to reproduce in its entirety, these examples are illustrative.  Cooper's allegations of racial discrimination by the City are phrased tentatively and without detailed factual support.  Many of the allegations are conclusory.  When pressed for details, he cites his general "experience" or "dealings" with the City (see, e.g., id at 20-21, 33) or falls back on his belief that "anything in [the City] is suspect" (id. at 46).  At one point, when asked directly whether he has "any evidence to support [his] claim that [he was] discriminated against in connection with the Helping Hands Project," Cooper replies, "I don't have any evidence, no."  Id. at 32.  In short, Cooper's deposition testimony provides no proof supporting his allegations, and thus creates no genuine issue of material fact regarding his claim of racial discrimination.

Cooper's responses to the City's interrogatories are likewise conclusory and lacking factual support.  In one illustrative response, Cooper states that, "the City of Bridgeport has historically awarded a low percentage of contracts to African Americans, even when those individuals or businesses run by those individuals were the lowest qualified bidder."  Exhibit 18 to Defendant's Motion for S. J. at Exh. A, 5.  In that answer, however, he offers no specific examples of a situation in which the City

awarded a contract to a non-minority bidder who was outbid by a minority bidder.[5]

Further, it is undisputed that no contract concerning the Helping Hand Project, the

project at issue in this case, was ever issued to a non-minority. Thus, Cooper's

interrogatory testimony regarding his experience with the City provides no proof

supporting his allegations, and creates no genuine issue of material fact regarding his

claim of racial discrimination.[6]

Resource Services next offers Cooper's interrogatory testimony regarding

George Eads to support its section 1983 claim. This testimony derives from an

interrogatory by the City asking Resource Services to "identify any and all acts which

constitute or concern [the City's alleged] long and persuasive practice of discrimination

based on race." Exhibit 18 to Defendant's Motion for S. J. at 9. In response to this

interrogatory, Cooper referenced certain conversations he had with George Eads, a

former employee of the City of Bridgeport. Specifically, Cooper stated that Eads

confirmed to him that "higher ups in the city government" steered higher-dollar-amount

contracts to non-minority contractors. Id. Resource Services does not offer any other

_____

[5]In an answer to a different interrogatory, Cooper states that Resource Services was the low bidder for a project known as the "Clean and Green Route 8 Project," but the contract was eventually awarded to a Caucasian bidder. At his deposition, Cooper testified that he believed the Clean and Green Route 8 Project was an example of nepotism on the part of the City because the contract was awarded to the relative of a prominent elected official at the time. See May 20, 2008 Deposition of Jimmy Ray Cooper, Exhibit Tr-1 to Defendant's Mem. in Opp. at 28. "Nepotism is not racism," however, and "[f]or an action based on racial discrimination to be maintained, it should go without saying that the discrimination must be based on race." Ivery v. Chrysler Corp., 31 Fed. Appx. 841, 847 (6th Cir. 2002).

[6]It bears noting that, in addition to the Clean and Green Route 8 Project, Resource Services alleges that the City discriminated against it on the basis of race with respect to a project known as the "34-36 Alex Street Project." The Alex Street Project involved interior repairs and upgrades to residential units in the City. At deposition, Cooper noted that a dispute developed between Resource Services and the City regarding costs on the project after he discovered a number of deficiencies in the units that were not visible when he placed his bid (e.g., rotting pipes and walls hidden behind cabinets). Tr-1 at 65-75. Cooper admitted, however, that the City did not breach the Alex Street contract, and offered no evidence that the City's conduct during the dispute surrounding that project was motivated by racial animus. Id.

14

evidence of these conversations between Cooper and Eads, and Cooper stated that he did not "recall the dates of those conversations." Id.

The Second Circuit has consistently held that, "under [Fed. R. Civ. P.] 56(e), only admissible evidence may be used to resist a motion for summary judgment." See, e.g., Rohman v. New York City Transit Auth., 215 F.3d 208, 218 n.6 (2d Cir. 2000). Therefore, Eads's hearsay testimony – to which the defendant objected on page 20 of its Motion for Summary Judgment – cannot be considered as support for Resource Services' equal protection claim.[7]

Resources Services' third piece of evidence in support of its section 1983 claim is the 2005 City of Bridgeport Disparity Study Regarding Minority Participation in Contracting ("the Mason Tillman Study" or the "Study").[8] Specifically, Resources Services cites, inter alia, the Study's finding that, between July 2000 and June 2003, "African Americans represent[ed] 6.31 percent of the available construction firms and received 4.69 percent of the construction prime contracts under $500,000.00," and that, "African Americans represent[ed] 2.44 percent of the goods and non-professional services firms and received none of the goods and non-professional services

_____

[7]Under Fed. R. Evid. 801(d)(2)(D), a statement is not hearsay if it is offered against a party and is made by that party's agent or servant concerning a matter within the scope of the agency or employment, during the existence of the relationship. In his deposition, Cooper describes Eads as a "former city employee." Exhibit 18 to Defendant's Motion for S. J. at 9. Cooper does not assert that his conversations with Eads took place while Eads was still working for the City, nor is there any such indication in the record. The only statement Cooper makes regarding the context of the conversations with Eads is that, he does not "recall the dates . . . ." Id. Consequently, the court has no basis to find that Eads' statements are admissions by a party opponent, and thus they are inadmissible under Fed. R. Evid. 801(c).

[8]This Study, commissioned by the City in 2004, was produced by Mason Tillman Associates, Ltd., a public policy research and public relations company that specializes in business and affirmative action program analysis, regulatory compliance, community outreach, and social marketing. See Exhibit 15 to Defendant's Mem. in Opp.

contracts." Complaint at ¶¶ 17-19; see also Mason Tillman Study, Exhibit 15 to

Defendant's Mem. in Opp., at 3. Further, the study concluded that, in both cases, the

disparities were "statistically significant." Id.

The law regarding evidence of disparate impact in equal protection cases is well

established:

> . . . [O]fficial action will not be held unconstitutional solely because it results
> in a racially disproportionate impact. "Disproportionate impact is not
> irrelevant, but it is not the sole touchstone of an invidious racial
> discrimination." Proof of racially discriminatory intent or purpose is required
> to show a violation of the Equal Protection Clause. Arlington Heights v.
> Metro. Hous. Dev. Corp., 429 U.S. at 264-65 (1977) (quoting Washington v.
> Davis, 426 U.S. 229, 242 (1976)).

Orange Lake Assocs. v. Kirkpatrick, 21 F.3d 1214, 1226 (2d Cir. 1994). Consequently,

absent other credible evidence, the Mason Tillman Study is insufficient to support an

inference that any of the City's decisionmakers acted with discriminatory intent or

purpose in relation to the Helping Hand Project. In other words, the findings of the

study create no genuine issue of material fact concerning Resource Services' claim that

the City discriminated against it on the basis of race.

For the foregoing reasons, Resource Services has failed to offer any "credible

evidence that the actions of [the defendant] were motivated by racial animus or ill-will."

Grillo v. N.Y. City Transit Auth., 291 F.3d 231, 234 (2d Cir. 2002). As a result, no

rational finder of fact could find in favor of Resource Services on its section 1983 claim

based on a violation of the Fourteenth Amendment's Equal Protection Clause. The City

is entitled to summary judgment on that claim.

2. Due Process

While it is apparent from its Memorandum that Resource Services claims the

City's actions violated the Due Process Clause of the Fourteenth Amendment, it is still necessary to determine whether this claim seeks to vindicate rights of procedural due process or substantive due process. See Local 342, Long Island Pub. Serv. Employees v. Town Bd., 31 F.3d 1191 (2d Cir. 1994) (distinguishing between procedural due process and substantive due process claims). Resource Services undertakes no due process analysis in its Memorandum, and the City mentions procedural due process only briefly in its Reply. See Defendant's Reply at 8. In the court's view, Resource Services' allegations can be read as asserting both types of due process claims. These claims require separate analysis.

   a. *Procedural Due Process*

   In order to sustain an action for deprivation of property without due process of law, a plaintiff must "first identify a property right, second show that the state has deprived him of that right, and third show that the deprivation was effected without due process." Mehta v. Surles, 905 F.2d 595, 598 (2d Cir. 1990) (per curiam). Accordingly, the court's threshold inquiry is to determine whether Resource Services was entitled to receive the financial benefits of the Helping Hands Project.[9]

   Property interests protected by due process are neither created nor defined by the Constitution. See Martz v. Incorporated Village of Valley Stream, 22 F.3d 26, 31 (2d Cir. 1994). "Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law – rules or understandings that secure certain benefits and that support claims of entitlement to

---

[9]Because the court concludes that Resource Services is unable to cross the threshold, the court does not reach the second or third inquiries.

those benefits." <u>Bd. of Regents of State Colleges v. Roth</u>, 408 U.S. 564, 577 (1972). In order for a person to have a property interest in a benefit such as the right to collect payment under a contract, "he must have more than a unilateral expectation of it. He must instead have a legitimate claim of entitlement to it." <u>Id.</u>

Even if the court assumes, for the purposes of this procedural due process analysis only, that there existed a contract between the City and Resource Services for the Helping Hand Project, Resource Services has not indicated a constitutionally protected property interest. The Second Circuit has held that, where a complaint alleges the breach of an ordinary contract, "the right to payment on such a contract does not rise to the level of a constitutionally protected property interest." <u>Martz</u>, 22 F.3d at 31. The court's rationale for this rule is simple:

> Whenever a person contracts with a state, breach by the state can be considered a denial of his entitlement to performance of the contract. If the concept of "entitlement" were this expansive, federal courts could be asked to examine the procedural fairness of every action by a state alleged to be in breach of its contracts. Yet, as the Seventh Circuit has observed, "We must bear in mind that the Fourteenth Amendment was not intended to shift the whole of the public law of the states into the federal courts." <u>Brown v. Brienen</u>, 722 F.2d 360, 364 (7th Cir. 1983).

<u>Martz</u>, 22 F.3d at 31. Consequently, even if proven, Resource Services' allegation that the City breached the contract for the Helping Hand Project does not give rise to a deprivation of a protectible property interest.

Resource Services' claim that the City engaged in conduct beyond mere breach of contract (<u>e.g.</u>, that the City improperly failed to award contracts to Resource Services), does not change the analysis. The Second Circuit considered a similar argument in <u>Eastway Constr. Corp. v. New York</u>, 762 F.2d 243 (2d Cir. 1985). In

Eastway, the plaintiff argued that New York City improperly excluded it from certain publicly-financed redevelopment projects. The Second Circuit rejected Eastway's due process claim, holding:

> Certainly, Eastway desired – and perhaps even needed or expected – to continue acting as a general contractor on public redevelopment projects. But it fails to point to a single constitutional, statutory or contractual provision that would entitle it to do so. And absent any such right, its claim that the City's actions violate § 1983 is incorrect as a matter of law.

Id. at 248. As a result, because Resource Services' does not offer evidence that creates a genuine issue of material fact as to whether it was deprived of any property interest protected by the Fourteenth Amendment, the City is entitled to summary judgment on that claim.

    *b. Substantive Due Process*

The Supreme Court has held that, "the Due Process Clause guarantees more than fair process, and the 'liberty' it protects includes more than the absence of physical restraint. The Clause also provides heightened protection against government interference with certain fundamental rights and liberty interests." Wash. v. Glucksberg, 521 U.S. 702, 719-720 (1997) (internal citations omitted). Notions of substantive due process will not apply, however, where "the alleged right cannot be considered so rooted in the traditions and conscience of our people as to be ranked as fundamental." Local 342, Long Island Pub. Serv. Employees v. Town Bd., 31 F.3d 1191, 1196 (2d Cir. 1994). Further, the doctrine of judicial self-restraint "requires courts to exercise the utmost care presented with a request to define or develop rights in this area." Id.

    While Resource Services does not specify the grounds for a substantive due process claim, it appears to the court that such a claim rests on Resource Services'

allegations that the City improperly breached the contract for the Helping Hand Project, and improperly refused to enter into other contracts.

The Second Circuit has held that, "we do not think . . . that simple, state-law contractual rights, without more, are worthy of substantive due process protection." Id. Further, in Local 342, the Second Circuit quoted with approval a Sixth Circuit decision stating that, "routine state-created contractual rights are not deeply rooted in this Nation's history and tradition, and, although important, are not so vital that neither liberty nor justice would exist if they were sacrificed." Charles v. Baesler, 910 F.2d 1349, 1353 (6th Cir. 1990) (citations omitted). Accordingly, as a matter of law, the City is entitled to summary judgment on Resource Services' section 1983 claim based on substantive due process.

3. Section 1981

In the context of a race-discrimination suit, "[i]n order for [a] plaintiff to prevail on . . . [a] claim[ ] for violation of . . . 42 U.S.C. § 1981, proof of racially discriminatory intent is required." Gant v. Wallingford Bd. of Educ., 195 F.3d 134, 139-140 (2d Cir. 1999). As discussed in detail with respect to the equal protection claim, Resource Services has failed to offer any evidence that the actions of the City were motivated by racial animus. Resource Services has not created a genuine issue of material fact as to whether the City acted with an intent or purpose to discriminate against it on the basis of race. Consequently, the City is entitled to summary judgment on Resources Services' section 1983 claim based on a violation of section 1981.

B. Counts Two and Three

Now that the court has determined that the City is entitled to summary judgment

on the civil rights claim, only the state law claims for breach of contract remain.  The court's jurisdiction over these claims exists solely by virtue of 28 U.S.C. § 1367.

When all federal claims have been dismissed prior to trial, it is appropriate for the district court to leave the state law claims to the state courts.  Giordano v. City of New York, 274 F.3d 740, 754 (2d Cir. 2001).  Indeed, it is more than appropriate: "[i]n general, where the federal claims are dismissed before trial, the state claims should be dismissed as well."  Marcus v. AT&T Corp., 138 F.3d 46, 57 (2d Cir. 1998).  Consequently, the court declines to exercise jurisdiction over Resource Services' breach of contract claims under Connecticut state law.

## V.    CONCLUSION

For the reasons discussed herein, defendant's Motion for Summary Judgment [Doc. No. 47] is **GRANTED** as to Count One.  Defendant's Motion to Dismiss [Doc. No. 48] is **GRANTED** as to Counts Two and Three, which are dismissed without prejudice to refiling in state court.  Judgment shall enter for the defendant, and the Clerk is directed to close the case.

**SO ORDERED**.

Dated this 18th day of December, 2008, at Bridgeport, Connecticut.


 /s/ Janet C. Hall_____
Janet C. Hall
United States District Judge

21